UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROGER JOHNSON,
    *Plaintiff*,

v.                                                No. 3:17-cv-00070 (JAM)

OFFICER CONLEY, *et al.*,
    *Defendants*.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Roger Johnson has filed this action against several officials of the Connecticut Department of Correction. He alleges that these officials violated his rights when they removed partitions in a prison bathroom. He further claims that the officials violated his rights by threatening and harassing him for complaints he made stemming from that incident. For the reasons stated below, I will grant defendants' motion for summary judgment.

**BACKGROUND**

The following facts are set forth in the light most favorable to plaintiff as the non-moving party. In August of 2014, plaintiff was working in the clothing factory at Osborn Correctional Institution. On August 4, 2014, defendant Officer Conley and defendant Supervisor Zawistowski removed the privacy partitions that surrounded the toilets in the bathroom used by inmate workers in the clothing factory. Officer Conley testified that he was directed to do so by Supervisor Ray Monroe because of graffiti on the partitions. Doc. #38-5 at 2. Conley and Monroe testified that partitions remained for two toilets, but plaintiff testified that all partitions were removed for a period of two or three days. Doc. #38-4 at 21.

When plaintiff asked Conley why the partitions were being removed, Conley responded, "so that you guys can holds hands while you take a shit." *Id.* at 28. Zawistowski laughed at the

1

comment, and said to plaintiff, "so do you think that they will get the message." *Id.* at 29. Plaintiff asked what that comment meant. Seeing that plaintiff was upset by the partition removal, Zawistowski contacted Supervisor Hussain and told him that plaintiff was upset. *Ibid.* Hussain then contacted Monroe. *Ibid.*

Monroe soon entered the clothing factory and stated that inmates are "fucking animals" who do not have any privacy rights when using the bathroom. *Id.* at 29. He further stated that inmates do not wash their hands after using the bathroom and take showers together either naked or while wearing boxers. *Ibid.* He then told the inmates that if an inmate wanted to use a restroom he would lock him in the bathroom and have Conley black out the windows. *Id.* at 29-30. Plaintiff understood this comment to be threatening and intimidating. *Id.* at 32.

In response to inmates raising privacy concerns, Monroe instituted a rule that inmates could only use the bathroom one at a time. *Id.* at 21; *see also* Doc. #38-6 at 2 (¶ 5). But inmates violated the rule. Doc. #38-4 at 21. Plaintiff, however, did not report the violation of the one-inmate rule at the time. *Id.* at 22.

While plaintiff was using the bathroom once without partitions, another inmate sat on the toilet next to him, rubbed against him, and gawked at him. *Id.* at 23. Plaintiff did not complain to the staff officers about the incident because he feared officers would retaliate against him. *Id.* at 23-24. Although there was another bathroom located right outside the entrance to the clothing shop, plaintiff did not ask to use it and believed that inmates were not permitted to use that bathroom. *Id.* at 22.

That same day, plaintiff filed an inmate request form to Commissioner Dzurenda, stating that he had been sexually harassed, threatened, and intimidated in the clothing factory by Conley and Monroe. Doc. #38-9 at 2. Dzurenda never responded to the complaint. Dzurenda attested that

2

he referred the matter to Warden Maldonado because he believed that matter was properly addressed at the facility level. Doc. #38-10 at 2. Warden Maldonado attested that he received the referral of the inmate request form/complaint. Doc. #38-11 at 2.

On September 7, 2014, plaintiff called the Prison Rape Elimination Act ("PREA") hotline. He recounted the partition incident and reported that he had been sexually harassed, threatened, and intimidated. Plaintiff believed that the phone conversation would be kept confidential, but PREA officials immediately contacted Osborn and informed defendant Lieutenant Correctional Officer Jamie Shepard that plaintiff had filed a PREA complaint. Doc. #38-4 at 36–37. An incident report shows that Lieutenant Fusaro, who had received plaintiff's PREA call, contacted Lieutenant Shepard so that Shepard could interview plaintiff and document the incident. Doc. #42 at 101.

Shortly after the phone call, Shepard called plaintiff to his office. When plaintiff arrived, he found defendants Shepard, Spruil, Hebert, and another officer present. Shepard yelled at plaintiff and said, "What is your fucking problem?" in reference to the PREA call. Plaintiff was stunned, because he believed his call was confidential. Shepard argued that plaintiff's claims amounted to a misunderstanding rather than sexual harassment and tried to convince plaintiff to drop his complaint. Lieutenant Hebert also threatened to take away plaintiff's job. Doc. #38-4 at 37–40, 42–43.

Plaintiff did not file any grievance complaining of retaliation, in part because he feared further retaliation. Doc. #38-4 at 43–44. Shepard prepared an incident report about the incident. Doc. #38-12 at 3–4. He then investigated the complaint and later closed it as meritless.

Plaintiff felt that his concerns were not being addressed so he sent a series of communications to different prison officials. He sent an inmate request form to Director of

Security Christine Whidden on October 21. Doc. # 42 at 123–24. Plaintiff also sent letters to the director of PREA on September 16, October 13, and October 24. *Id.* at 119–121, 126.

On October 25, 2014, plaintiff attempted to mail legal documents to the PREA unit and to the Connecticut state police. He gave the documents to defendant Mia Lawrence, a counselor, in a sealed envelope. The mail never reached its intended destination, and plaintiff believes that Lawrence destroyed the documents to prevent them from being mailed. Plaintiff never filed a grievance about the alleged interference with his mail. Doc. #38-4 at 44–45.

On March 13, 2015, plaintiff was transferred from his job in the clothing factory to a job in the officers' clothing workshop. Plaintiff alleges that defendant Hussain transferred him in retaliation for plaintiff's earlier complaints of sexual harassment and that Hussain had called him a troublemaker. Plaintiff never filed a grievance complaining that he was wrongfully transferred from the clothing factory. Doc. #38-4 at 77–81. The record shows that on April 21, 2014, plaintiff had filed an inmate request form asking to be moved from the clothing factory to officers' clothing. Doc. #38-6 at 13. Plaintiff concedes that he "indeed filed a request to go to officer's clothing." Doc. #42 at 7. Supervisor Beecher testified that the transfer occurred because of plaintiff's request, which was approved by Monroe. Doc. #38-7 at 3.

In May 2015, plaintiff wrote a letter to the Connecticut state police. In the letter he stated that he attempted to file a written criminal complaint against prison staff for sexual harassment, but it was intercepted by the prison and never sent. Doc. #38-4 at 109. On May 29, the Connecticut state police forwarded the letter to Commissioner Semple. In June and July, plaintiff sent several letters to the state police inquiring about his complaint. Doc. #42 at 138, 140.

On June 12, 2015, Captain Colon summoned plaintiff to his office. When plaintiff arrived in the office, he was confronted by Colon, as well as by defendants Correctional Officer Acus

4

and Lieutenant Brown. Colon yelled at plaintiff and forced him to stand in a corner of the office. Plaintiff stated several times that he did not feel safe and wanted to leave the office. Colon responded, "oh you feel threatened? How about if I take your ass to seg? Will you feel safe there?" Plaintiff requested to leave so that he could contact the state police. Acus then showed plaintiff a letter that plaintiff had sent to the state police and began yelling at plaintiff for sending the letter. Colon also yelled at plaintiff for contacting the state police. Plaintiff alleges that Colon pinned him to the wall by pressing on his chest, causing plaintiff to hit his head. Another Lieutenant then entered the office and asked what was going on. Captain Colon explained that the warden had requested that he handle "this bitch." Plaintiff did not sustain any injuries and did not go to the medical unit. Doc. #38-4 at 70–77.

Plaintiff immediately filed an inmate request form to Warden Maldonado complaining of threats and intimidation by Colon, Acus, and Brown. Doc. #38-20 at 2–3. Colon, Acus, and Brown filed supplements to the incident report of September 7, 2014, describing the events. Doc. #38-12 at 7.

On February 11, 2016, defendant counselor Lawrence told plaintiff that he had received a legal call. Plaintiff returned the legal call, and spoke to an advocate from the Connecticut Sexual Assault Crisis Service ("Conn. SAC"). The call took place in the CO bathroom, which was routinely used for inmate legal calls. While plaintiff was on the phone, Lawrence disrupted the call. She yelled at plaintiff, pulled a chair out from under him, flung another chair at plaintiff from across the room, and stood over his shoulder in order to listen to his phone conversation. Plaintiff was not injured by Lawrence's actions and never filed a grievance regarding this incident. Doc. #38-4 at 48–55.

On March 24, 2016, Counselor Lawrence and Captain Colon entered the clothing workshop where plaintiff was working. Lawrence approached plaintiff and yelled at him and questioned him about the February 11 phone call. Plaintiff responded that he did not want to discuss the call. At the time of this confrontation, plaintiff was operating a high-powered embroidery machine. Lawrence pinned plaintiff up against the machine while it was in motion and spit in his face while she was speaking. Plaintiff repeatedly asked Lawrence to step back. Colon stood nearby watching but took no action to intervene. Plaintiff told Lawrence that he would like to speak to her supervisor, who plaintiff believed to be Captain Colon. She responded that her supervisor did not want to speak with him. As Lawrence turned to leave, she told plaintiff, "write this incident up. I know you will. I don't give a fuck," and then walked away. Doc. #38-4 at 55–65.

Plaintiff believes Lawrence's behavior was retaliation for the fact that plaintiff's advocate from Conn. SAC had reported Lawrence to Commissioner Semple for her inappropriate behavior during the February 11 phone call. Plaintiff testified that he filed a grievance against Counselor Lawrence, but never received any response. He stated further that he filed an appeal, but also did not receive a response. He then filed an inmate request form to Commissioner Scott Semple requesting to file a criminal complaint to the Connecticut state police against Lawrence and Colon for threatening and assaulting him. Doc. #38-4 at 104. Deputy Commissioner Rinaldi responded via letter on April 19, 2016. Doc. #38-4 at 110. The letter acknowledged plaintiff's letter to Commissioner Semple and noted that it was sent to the warden for review. It also reminded plaintiff to pursue his complaints via the administrative remedies system. Rinaldi sent another letter to plaintiff on June 12, 2015, stating that there was no record of his allegations being reported. *Id.* at 111.

Plaintiff later filed a grievance complaining that Deputy Commissioner Rinaldi reviewed to contact the state police on his behalf. He did not receive a response, and he did not appeal the non-response. Doc. #38-4 at 69.

### DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

*Exhaustion of Administrative Remedies*

Defendants argue that they are entitled to summary judgment as to all of plaintiff's claims that were not specifically articulated in his PREA complaint because plaintiff failed to exhaust his administrative remedies.[1] The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies before filing a federal lawsuit relating to prison conditions. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). This

---

[1] Defendants state that the DOC does not require allegations set forth in a PREA complaint to be grieved separately. Doc. #38-1 at 22 & n.1.

exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 740–41 (2001). Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90–93 (2006).

An inmate's failure to exhaust administrative remedies is excusable if the remedies are in fact unavailable. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). An administrative remedy procedure is unavailable when it operates as a simple dead end, with officers unable or consistently unwilling to provide any relief to aggrieved inmates. *Id*. at 1859. Unavailability may also be found where an administrative scheme is so opaque that it becomes incapable of use. *Ibid*. Finally, a grievance process is rendered unavailable if prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation. *Id*. at 1860.

As to most of the incidents that comprise the basis of plaintiff's retaliation and excessive force claims, plaintiff filed no grievances at all. He testified that he did not file grievances because of fear of retaliation. Doc. #38-4 at 43–44, 47–48.

As to the June 12 office meeting incident, plaintiff filed an inmate request form to Warden Maldonado, but did not file a Level 1 grievance after failing to receive a satisfactory response. *See Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (explaining Connecticut Department of Correction administrative remedy procedure that requires filing a Level 1 grievance if inmate receives no response to inmate request form or the remedy offered is unsatisfactory).

8

As to the incident of March 24, 2016, plaintiff testified that he filed a grievance, received no response, filed an appeal, received no response, and then wrote a letter to Commissioner Semple. Plaintiff filed the purported grievances with his briefing. Doc. #42 at 186, 188. Neither of the grievances attached by plaintiff mention Colon or Lawrence, spitting, nor any details relating to the March 24 incident. Moreover, neither of the purported grievances attached the inmate request form as is required of all grievance filings. Osborn Correctional Institution has no record of any grievance of appeal. Doc. #38-1 at 19. Furthermore, the appeal letter to Semple was written the same day as the incident, and therefore could not have been written as a result of any nonresponse to his appeal. Doc. #38-16 at 2. The foregoing casts doubt on whether these grievances were ever filed. *See Chambers v. Johnpierre*, 2016 WL 5745083, at *7 (D. Conn. 2016) (holding that plaintiff's "unsupported statements that he filed grievances and grievance appeals . . . do not create an issue of fact with regard to the exhaustion of his claims") (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)). But even if plaintiff had filed these grievances as he alleges, the grievances do not mention the March 24 incident, Colon, or Lawrence and could therefore not serve to exhaust plaintiff's remedies as to that incident or those defendants.

Finally, plaintiff testified that after April 2016 he filed a grievance against Rinaldi, but never received a response. He did not appeal the lack of response.

It is thus clear that plaintiff failed to exhaust his administrative remedies as he was required to do. Nor has plaintiff shown that the grievance procedure was "unavailable" to him in any of the ways described by the Supreme Court in *Ross*. There is nothing in the record to suggest that the administrative remedy procedure was a dead end or that it was so opaque as to be incapable of use. Plaintiff does not point to any evidence suggesting that prison administrators

thwarted him from taking advantage of the grievance process. Moreover, "a plaintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance." *Briscoe v. D'Agata*, 2016 WL 3582121, at *8 (S.D.N.Y. 2016).

Although plaintiff argues that any grievances would have been superfluous, this argument is unavailing in light of the specific circumstances set forth in *Ross* for excusing a failure to exhaust. Plaintiff also cites cases suggesting that informally complaining is sufficient, but the Second Circuit has recognized that earlier cases allowing for more informal exhaustion of remedies have been overruled by *Woodford* and that prisoners must utilize formal grievance procedures. *See Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007).

Accordingly, I will deny all of plaintiff's claims except for those that were within the scope of plaintiff's PREA complaint. Plaintiff's First Amendment retaliation and excessive force claims are dismissed in full. To the extent that plaintiff's Eighth Amendment deliberate indifference to safety claim arises from any later alleged assaults, threats, or intimidation, I will dismiss that portion of the claim as well on the ground that plaintiff failed to exhaust his administrative remedies. All that remains is plaintiff's claim arising from the removal of bathroom partitions.

### *Removal of Bathroom Partitions*

Plaintiff alleges that defendants violated his constitutional rights by temporarily removing the bathroom partitions for two to three days at the bathroom that prisoners used adjacent to his prison work area. I understand these allegations to raise a substantive due process claim for violation of privacy under the Fourteenth Amendment, as well as a claim for cruel and unusual punishment under the Eighth Amendment. As I noted in my initial review order, the Second Circuit has recognized that "prisoners retain a right to bodily privacy, even if that right is limited by institutional and security concerns." *Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir. 2005). In order to establish an Eighth

Amendment violation, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official. *See Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

Even assuming a violation of a prisoner's constitutional rights, a prison official may have qualified immunity from a claim for money damages. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*per curiam*). Qualified immunity protects a government official from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010).

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotations omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the ... constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also*

11

*White v. Pauly*, 137 S. Ct. 548, 552 (2017) (denial of qualified immunity on excessive force claim was in error where court "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," and instead relied on cases that "lay out excessive-force principles at only a general level").

Notwithstanding the generalized right of prisoners to privacy and to be free from cruel and unusual punishment, there was no clearly established constitutional right as of August 2014 for prisoners to be free from a temporary removal of partitions in a bathroom used by prisoners during the day near their work area. The parties have not cited any cases recognizing such a right. *See Nwani v. Molly*, 2018 WL 2461987, at *9 (E.D. Pa. 2018) ("As courts repeatedly have held, the act of prison officials in watching an inmate on the toilet does not violate the Fourth Amendment right to privacy, owing to the officials' legitimate penological interests in maintaining prison security and discipline," and "[p]laintiff similarly fails to state a claim under the Eighth Amendment because being watched on the toilet does not amount to a risk to Plaintiff's health or safety.").

Nor is it intuitively obvious that the Constitution does create such a right. Indeed, it is commonplace in prisons to have toilets within double cells that have no partitions between the toilet and rest of the cell. It would be surprising to any objectively reasonable prison official to learn that the Constitution prohibits even a temporary removal for two or three days of partitions in bathrooms used by prisoners during the work day. *See MacDonald v. Angelone*, 69 F. Supp. 2d 787, 793 (E.D. Va. 1999) ("Because the existing controlling case law does not make clear that removing a paper covering from a cell observation window violates an inmate's constitutional right to privacy, even if, as a result, persons may view him using the toilet, reasonable officials in the place of defendants would not clearly understand that their specific actions and policies violated plaintiff's right to privacy.").

In addition, plaintiff concedes that prison officials instituted a rule that only one prisoner at a time should use the bathroom for the two to three days that the partitions were gone. Although plaintiff alleges that this rule was violated, there is no genuine fact issue that any particular defendant knew of or encouraged a violation of this rule during the few days that the partitions were gone. This is further reason to conclude that defendants have qualified immunity from plaintiff's claim.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (Doc. #38) is GRANTED. Plaintiff's motion for hearing (Doc. #45) and motion to appoint counsel (Doc. #51) are DENIED as moot. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 5th day of September 2018.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge